**IOWA–ILLINOIS GAS AND ELECTRIC COMPANY, Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

**Office of Consumer Advocate, Intervenor-Appellee.**

**OFFICE OF CONSUMER ADVOCATE, Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

**Iowa-Illinois Gas & Electric Company, Intervenor-Appellee.**

No. 86–523.

Supreme Court of Iowa.

Sept. 23, 1987.
Rehearing Denied Oct. 22, 1987.

Brent E. Gale and Edward J. Hartman, and D.H. Sitz and Terry M. Giebelstein of Lane & Waterman, Davenport, for appellant Iowa-Illinois Gas & Elec. Co.

Susan Allender, Gen. Counsel, Patrick J. Nugent, Deputy Counsel, and David J. Lynch, Asst. Gen. Counsel, Des Moines, for appellee.

James R. Maret, Consumer Advocate, and David R. Conn, Des Moines, for Office of Consumer Advocate.

HARRIS, Justice.

All parties appealed from a judicial review proceeding. The district court for the most part affirmed a state commerce commission order which rejected a utility's application for a rate increase. We affirm on all appeals.

In 1976 petitioner Iowa-Illinois Gas and Electric Company undertook a long-term study of alternate energy sources. At the time it projected a 302 megawatt deficiency in electric generation for the year 1984. After assessing its consumer needs, as well as those of other investor-owned cooperative and municipal utilities in Iowa, the company concluded it should construct a 650 megawatt generating plant. Iowa-Illinois was to use 300 megawatts for its customers. The remainder was to be used for commitments it received from other public utilities.

On January 1, 1977, before the company could actually begin construction of its pro-

posed plant, Iowa Code chapter 476A [1] became effective. Section 476A.2 prohibits construction of an electric power generating plant with a capacity of 100 megawatts or more in the absence of a commerce commission certificate of the proposed project's "present or future public convenience, use, and necessity." This certificate can be issued only by the commission upon public notice and hearing. The hearings must be conducted in the same manner as contested case proceedings. Iowa Code § 476A.4.

Iowa-Illinois Gas and Electric Company fully complied with chapter 476A and its accompanying administrative regulations. [2] It applied for a certificate of public convenience, use, and necessity for its project with the Iowa state commerce commission. [3] Compliance was no perfunctory task. The company's seven volume application proposed the construction of a $257 million coal-fire generating facility in Louisa and Muscatine counties with $158 million of its investment allocated to Iowa consumers. After notice [4] and hearing Iowa-Illinois was able to satisfy the commission that the proposed project was required by present and future public convenience, use, and necessity. The company also convinced the commission that: (1) it was ready, willing, and able to construct, maintain, and operate the facility in accordance with governmental limitations and with minimal adverse environmental impact; (2) it had a comprehensive and efficient management program in effect to reduce peak loads; and (3) it had considered all other feasible alternatives and found the proposed project the most efficient and cost-effective.

On April 3, 1979, the commission issued the certificate for the project and entered an order finding:

1. The anticipated demand for electrical power provided by applicant justifies the securing of additional power sources in the 650–MW capacity proposed.

2. The alternative for meeting the need for additional electric power selected by applicant is the most economically feasible.

After receiving the certificate Iowa-Illinois obtained investor funds and began construction of its Louisa generating station. By 1979, however, a "severe economic downturn" caused a decrease in electric consumption. This prompted Iowa-Illinois to commission a consulting firm to explore "whether the lowest cost alternative for customers would be produced by continuing to construct the additional generation on the original schedule or deferring the completion." The consultants recommended that construction continue, but without incurring unnecessary overtime expenses. A 1981 study commissioned by the utility reached the same conclusion, recommending a construction schedule which would bring the addition into service in mid to late 1983.

On May 26, 1983, as the project neared completion, [5] Iowa-Illinois filed an application for "revised electric tariffs" with the commission. The company's primary goal in seeking nearly $44.6 million in additional annual electric revenues (a 35.5% increase) was "to recognize in rates Iowa-Illinois' $158 million investment in additional electric generation...." In this way the utility claimed it "could begin the process of obtaining from customers the return paid to investors for their investment in electric generation dedicated to public use and service."

Following the requisite notice, hearing, opportunity for public comment, and contested case proceeding, the commission issued its decision. The commission's April

---

1. Except where otherwise indicated, all references are to the 1977 Code.

2. 250 Iowa Admin.Code 24.1, *et seq.*

3. Now known as the utilities board of the Iowa department of commerce, pursuant to the recent organization of Iowa state government. 1983 Iowa Acts ch. 127. All references in this opinion will be to the agency under its former name.

4. As we shall see, written notice need not be given to all consumers.

5. According to the respondent commission, the Louisa generating station's in-service date was October 13, 1983.

25, 1984, order found the proposed tariffs and their accompanying rates "unjust, unreasonable, and unlawful," and limited the increase to $30.3 million.

The limitation on the company's request was based upon finding the company's construction of the Louisa facility created significant "excess generating capacity," not currently useful or necessary for adequate and reliable service to the company's customers. °There were a number of applications for rehearing of the final order. All were denied.

I. Under the administrative law scheme nearly all disputes are won or lost at the agency level. Our review of agency action under Iowa Code section 17A.20 is carefully confined to the correction of errors of law. *Polk County Drainage Dist. Four v. Iowa Natural Resources Council,* 377 N.W.2d 236, 239 (Iowa 1985). We apply the standards outlined in Iowa Code section 17A.19(8). *LeFebure Corp. v. Iowa Dep't of Job Serv.,* 341 N.W.2d 768, 770 (Iowa 1983). The burden rests squarely on the challenger to show that an agency's policy choices were unreasonable; we defer readily to the agency's expertise. *Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n,* 359 N.W.2d 491, 497 (Iowa 1984). The commerce commission's rate-fixing power under Iowa Code chapter 476 is legislative in nature, and courts have no authority to determine whether the commission acted "wisely" in adopting a particular policy. *Davenport Water Co. v. Iowa State Commerce Comm'n,* 190 N.W.2d 583, 592 (Iowa 1971). Assignments of error which present constitutional issues require an independent evaluation of the totality of evidence from which the assertion of unconstitutionality arises. Evidence relevant to that issue is reviewed de novo. *State v. Snethen,* 245 N.W.2d 308, 311 (Iowa 1976).

II. The first question is whether the commission's findings in issuing the April 3, 1979, certificate for the project are binding in this ratemaking proceeding that followed the project completion. Iowa-Illinois contends the commission's 1979 "finding of fact regarding the usefulness of cumulative investment" was in fact "made for ratemaking purposes" and was conclusively established for purposes of the ratemaking process now at issue.

The commission contends the 1979 determination had no such purpose or effect. In its view the earlier determination was limited to the reach of the certificate itself: authorizing construction of the facility on the site and giving Iowa-Illinois the necessary power of eminent domain.

*Iowa-Illinois Gas and Electric Co. v. Iowa State Commerce Commission,* 347 N.W.2d 423 (Iowa 1984), involved a due process challenge to the commission's refusal to fix a rate which would allow the utility to recapture its cost of constructing expanded generating facilities. It was shown that, when it was made, the decision to expand generating capacity was prudent. But at the ratemaking stage, when the enlarged capacity was in place, the commission found a substantial excess in usefulness and adjusted the rate to disallow recapture of the excess. We rejected Iowa-Illinois' due process challenge. 347 N.W.2d at 429.

In *Office of Consumer Advocate v. Iowa State Commerce Commission,* 395 N.W.2d 1 (Iowa 1986), the commerce commission had entered a declaratory ruling under Iowa Code section 17A.9. The commission ruled that the cost of a proposed purchase (25 megawatts of ownership in an electric generating plant) "shall be included in the rate base," and went on to detail the accounting treatment of the adjustment amount.

On appeal we limited our affirmance to that part of the commission's ruling which had to do with the utility's accounting practices. We reversed the commission's holding (affirmed by the district court) which would have rendered the declaratory approval of the purchase binding in later ratemaking proceedings. We said:

> The order should be modified to provide that the unamortized acquisition adjustment for accounting purposes may be included in the [e]lectric [p]lant accounts in the manner prescribed by the [c]ommission's [u]niform [s]ystem of

[a]ccounts; *however, if Interstate wishes to include these costs in its rate base, it must file an application for a rate change and make appropriate proof under Iowa Code section 476.6.*

*Id.* at 7 (emphasis added).

There is a question whether the present case can be distinguished from *Office of Consumer Advocate v. Iowa State Commerce Commission.* The declaratory ruling in that case seems to have been obtained without the widespread ratepayer participation evident here. The commission points out that, in seeking a certificate of convenience and necessity, a utility is required under section 476A.4(2) to give notice only to county and city zoning authorities from the area of the proposed site and to owners of real property located within 1000 feet of the site. Ratepayers (who would be entitled to written notice of a proposed rate increase under section 476.6) get no notice other than the general published notice of a chapter 476A hearing. *Office of Consumer Advocate v. Iowa State Commerce Commission* does stand for the proposition, at least, that chapter 476 rights of ratepayers cannot be shortchanged by other proceedings in which they were not invited to participate.

We then take it as established: (1) the utility sought to build the generating facility which it thought was practical; (2) the utility persuaded the commission that the construction was prudent and in the public interest; (3) the investment later proved to be significantly unnecessary; (4) shareholders, not ratepayers, must ordinarily stand the loss when prudent decisions to invest prove imprudent after the fact; and (5) ratemaking proceedings, being legislative in nature, need not presuppose those determinations previously made in other contexts with less than full participation by the ratepayers.

Ratepayer participation at both proceedings was widespread in this case. But the question remains whether the determinations which went into the issuing of the chapter 476A certificate were for the same purposes as those made in the later ratemaking proceeding under chapter 476. Although the ultimate goals may be similar, the functions of the two proceedings clearly differ.

 The function of a ratemaking proceeding is to establish a reasonable and just amount to be paid for the utility's goods and services. In *Iowa-Illinois* we explained:

> "Rate of return" is the percentage of return that the utility is entitled to earn on its rate base through its rates. Due process requires "a fair return on investment."

347 N.W.2d at 427 (citation omitted).

The regulation of public utility rates and services is vested exclusively in the commerce commission under the comprehensive framework outlined in Iowa Code chapter 476. Public utilities proposing rate increases are required to file an application with the commission, to provide written notice to affected consumers, to file factual evidence and written arguments in support of the proposed increase, and to attend and participate in contested case proceedings. Iowa Code § 476.6. Section 476.6(9) empowers the commission to approve the proposed rate increase or to declare it "unlawful." Section 476.13 provides a mechanism for judicial review. Traditional ratemaking principles recognize that a utility's present ratepayers may only be required to pay for those portions of a utility's investment which are "used" or "useful" in rendering service to them. *Iowa-Illinois,* 347 N.W.2d at 429.

The function of a proceeding for a chapter 476A certificate of convenience and necessity, though related, is much broader. We note and approve the following:

> The purposes of requiring a certificate of convenience and necessity are to protect the public from speculation and duplication of facilities, and from inadequate service and higher rates which frequently result from such duplication, and to protect utilities from competition. Such purposes reflect a policy that the public is better served by a regulated monopoly than by competing suppliers of the service.

73B C.J.S. *Public Utilities* § 69(c) (1983). *See also* 64 Am.Jur.2d *Public Utilities* § 237 (1972).

The utility's reliance on the doctrines of collateral estoppel and res judicata is misplaced. In *Israel v. Farmers Mutual Insurance Association of Iowa,* 339 N.W.2d 143, 146 (Iowa 1983), we recognized that "[a]n adjudication in a former suit between the same parties on the same claim is final as to all matters which could have been presented to the court for determination." We listed four prerequisites for issue preclusion:

(1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*Id.*

■ Iowa-Illinois' issue preclusion argument must fail on the first element. The issue addressed in the chapter 476A proceeding (whether to grant a certificate of public convenience, use, and necessity, authorizing construction of the facility) and the issue addressed in the chapter 476 proceeding (whether, given the existence of excess generating capacity, an adjustment of rates to facilitate a sharing of costs between consumers and investors would be just and reasonable) are divergent. In the absence of identical issues, raised and litigated in prior proceedings, the doctrine of issue preclusion is inapplicable.

■ Iowa-Illinois' equitable estoppel claim, rejected summarily by the district court, is also without merit. According to Iowa-Illinois it relied to its detriment upon the commission's issuance of the chapter 476A certificate for the Louisa addition, presuming from the commission's approval of the project that it would not later deny all common equity return on the investment. As the United States Supreme Court recognized in *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 2223,

81 L.Ed.2d 42, 51 (1984), "estoppel is an equitable doctrine invoked to avoid injustice in particular cases." The doctrine is applicable where one person

makes a definite misrepresentation of fact to another, having reason to believe that the other will rely upon it and the other in reasonable reliance does act upon it .... the first person is not entitled ... to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before the discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

*Id.* (citing Restatement (Second) of Torts § 894(1) (1979)). In order to establish an estoppel claim a party must demonstrate reasonable reliance upon an adversary's conduct "in such a manner as to change [the claimant's] position for the worse." *Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223, 81 L.Ed.2d at 51 (citing 3 J. Pomeroy, *Equity Jurisprudence* § 805, at 192 (S. Symons ed. 1941)). The *Heckler* court acknowledged the particularly heavy burden of proving an estoppel claim against the government, noting:

When the [g]overnment is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interests of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that ... [g]overnment may not be estopped on the same terms as any other litigant.

*Heckler,* 467 U.S. at 60, 104 S.Ct. at 2224, 81 L.Ed.2d at 52.

■ On these facts the commission's issuance of a certificate of public convenience, use, and necessity for the Louisa generating addition was not accompanied by a "definite misrepresentation" that it would later approve a rate increase permitting the utility to recapture all equity return on its investment. On the contrary the commission's chapter 476A proceedings did not even address the issue of a rate increase.

■ The district court was correct in holding that principles of equitable estoppel, collateral estoppel, and res judicata do not bar the commission's limitation on Iowa-Illinois' requested rate increase. Chapter 476A's certification proceedings do not conclusively bind subsequent chapter 476 ratemaking decisions.

■ III. The commission's denial of a common equity return on $42.6 million of investment in the Louisa plant, according to Iowa-Illinois, amounts to an unconstitutional interference with reasonable investment-backed expectations. Iowa-Illinois contends the commission's chapter 476A approval of the plan led it to reasonably expect "an opportunity to earn a fair return on prudent investment in property used or useful in providing service to the public." This expectancy interest, Iowa-Illinois contends, "extended to all, not just a portion, of [its] investment in the enterprise." In the utility's opinion, the commission's denial of a return on its investment represented an unconstitutional deprivation of its property, in contravention of the fifth and the fourteenth amendments to the United States Constitution and article I, sections 8 and 18 of the Iowa Constitution.

The contention proceeds from a well established principle. In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the United States Supreme Court recognized that the fifth amendment bars the government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." 438 U.S. at 123, 98 S.Ct. at 2659, 57 L.Ed.2d at 648. *See also Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1555, 1561 (1960). The *Penn Central* court held that the economic impact of a challenged regulation upon a claimant, as well as "the extent to which the regulation has interfered with distinct investment-backed expectations," are relevant considerations in discerning whether the regulation "will be rendered invalid by the government's failure to pay for any losses proximately caused by it." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659, 57 L.Ed.2d at 648 (citing *Goldblatt v. Hempstead*, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130, 134 (1962)). In relative terms, the *Penn Central* majority concluded that a "taking" of private property for public use may "more readily be found," when the interference "can be characterized as a physical invasion by government ... than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.*

The district court was correct in rejecting the challenge. In explaining the constitutional principle in *Iowa-Illinois Gas and Electric Company*, we pointed out:

Nothing in the constitutional requirement that a utility receive a fair return on its investment prohibits a lower return from the ratepaying public upon a part of the investment which turns out to be unnecessary, even when the utility's decision to make the investment was prudent. The issue for the Commission was how to allocate the burdens created by a management investment mistake between ratepayers and utility common stockholders. Utility investors are not insulated from the consequences of diseconomies resulting from a management decision that was prudent when made but which later events prove to have been mistaken.

347 N.W.2d at 429.

There was no "physical invasion by government" of the utility's property here. The commission merely balanced the "benefits and burdens" of the project between investors and consumers. This is the essential and proper function of the commission.

Our cases have long recognized the commission's obligation to engage in balancing, "even if [it] should result in no net revenues for the utility." *Iowa-Illinois Gas & Elec. Co.*, 347 N.W.2d at 428 (citing *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345 (1944)); *see also Permian Basin Area Rate Cases*, 390 U.S. 747, 749, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312, 337

(1968) (regulation may, consistently with the constitution, limit stringently the return recovered on investment).

A further consideration supports the district court decision. In order for the courts to interfere with an agency ratemaking decision, "the return filed by the agency must be outside the zone of reasonableness," which

> depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts.... The return should be reasonably sufficient to assure confidence in the financial soundness of the utility, and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.

*Iowa-Illinois Gas & Elec. Co.*, 347 N.W.2d at 428 (citing *Bluefield Waterworks & Improvement Co. v. Public Serv. Comm'n*, 262 U.S. 679, 692–93, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1182–83 (1923)).

We think the rates challenged here were within the "zone of reasonableness," representing a balanced solution to the problem of petitioner's cumulative excess generating capacity. *See Iowa-Illinois Gas & Elec. Co.*, 347 N.W.2d at 429 ("All units may be used or useful when viewed individually, but the determinative issue is whether the cumulative investment is used and useful."). The commission's ruling allows Iowa-Illinois to recover all of the direct costs of its investment, depriving the company only of that portion of its equity return associated with its creation of excess capacity. As in the previous Iowa-Illinois case, the utility's consumers should not be required to absorb parts of the Louisa investment which later events have proved unnecessary and excessive. *See Denver Stockyard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469, 1476 (1938) (A utility's present ratepayers should not be required to pay

for a portion of company's facilities not used or useful in serving them.). Investors in public utilities are simply not insulated from diseconomies.

IV. In its cross appeal OCA raises statutory challenges to four commission rulings. The district court rejected three of the challenges but agreed with the fourth.

A. In setting the rate the commission considered the "estimated costs" of operating the Louisa plant. OCA contends this violated Iowa Code section 476.33(4) which, it is claimed, limits the commission in rate regulatory proceedings to consideration of "verifiable data that exists as of the date of commencement of the proceedings." Because, OCA contends, the utility was unable to provide verifiable data on its investment in the Louisa generating station "as late as August 9, 1983" (several months *after* commencement of these proceedings), it was error for the commission and the district court to accept the company's cost estimates as "generally known and measurable." OCA contends the commission's construction of Iowa Code section 476.33(4) rendered part of the statute "superfluous," allowing the commission "to conduct its business as if the section did not even exist." In order to insure that utility revenues and costs were not "mismatched," OCA maintains, the commission should have required Iowa-Illinois to present concrete evidence of its investment, revenues, and expenses from an actual "test year" before attempting to set just and reasonable rates.

The district court correctly rejected this challenge. Estimated costs are a proper and probably necessary consideration in setting rates during the first year of a plant operation. Otherwise the utility could recover for no costs until it presents verifiable evidence after a year or more of operation.

B. OCA's second statutory challenge is based on the commission's holding that Iowa Code section 476.53 [6] was inappli-

---

**6.** Iowa Code section 476.53 provides:
> *Excess Capacity:* ... [I]t is in the public interest that public utilities subject to rate regula-

tion, at a minimum, be prohibited from including either directly or indirectly in their charges or rates to customers the return on

cable in these ratemaking proceedings. It is a question of when the statute became effective. It was adopted by the General Assembly in 1983 and expressly made effective for rate applications filed after July 1, 1983, "except as provided under section 50 of [the] Act." Section 50, which was never codified, provides:

> On or after the effective date of this Act [July 1, 1983,] the Iowa state commerce commission shall not approve an application for a new or changed rate . . . filed with the Commission by a public utility furnishing electricity which includes as part of the rate base the costs of an electrical generating facility which does not go on line until after the effective date of this Act unless the new or changed rate . . . complies with section [476.53]. . . .

1983 Iowa Acts ch. 127 § 50.

The commission applied section 476.53 to Iowa-Illinois' application, concluding under section 50 that the Louisa generating station went "on-line" (i.e., began serving customers) in October 1983. The district court however concluded that section 50 precluded the application of section 476.53 because the facility actually went "on-line" before July 1, 1983. The district court determined that "on-line" has a fixed, technical meaning, denoting the time when a facility is "synchronized with the electric transmission grid" and *capable* of providing service to customers, not when it actually begins providing service. Under the district court's definition, the Louisa facility went "on-line" on June 13, 1983; under the commission's definition it went "on-line" on October 13, 1983.

We think the district court correctly concluded the term "on-line" has a fixed, technical meaning in the utility industry, which refers specifically to the date an electric generating facility is "connected or synchronized on the electric transmission *line* and producing power." For the Louisa facility, the parties agree, this occurred on June 13, 1983. On this date, when the facility was *capable* of supplying electricity, it was "on-line." To confuse the Louisa "on-line" date with the date on which it went "in-service," would be to render the terms interchangeable and confusing.

Because the Louisa facility went "on-line" before the date on which Iowa Code section 476.53 became effective the district court was right in holding the statute inapplicable in this case.

C. OCA next complains that rulings of the commission and the district court impermissibly permitted Iowa-Illinois to earn "illegal" returns on its excess generating capacity. According to OCA the ruling: (1) overstated the utility's peak demand for 1984 by including in its estimate 12 megawatts of capacity which Iowa-Illinois saved by implementing a "peak alert program" [7] and 25 megawatts it saved by placing certain high-volume customers on an "interruptible rate" program; [8] (2) arbitrarily set the utility's "proper reserve margin" at 25% in excess of its peak demand; (3) understated the utility's "available" generating capacity for 1984 by failing to consider 100 megawatts of electricity which Iowa-Illinois contracted to sell at bargain prices; and (4) undervalued Iowa-Illinois' investment in excess generating capacity by refusing to calculate it on a "unit-specific" basis.

Before addressing the merits of these claims a background discussion of excess generating capacity calculations might be helpful. A public utility's excess electric generating capacity is determined by the commission, which first ascertains

---

common equity associated with excess electric generating capacity.... The [commission] shall not allow a return on common equity on that portion of a public utility's electric generating capacity which is determined to be excess electric generating capacity.

7. A program designed, under 199 Iowa Admin. Code 20.11, to reduce peak demand by requiring utilities to notify customers of an approaching peak and asking them to voluntarily conserve electricity.

8. Under 199 Iowa Admin.Code 20.10(6) the commission requires utilities subject to rate regulation to place certain high energy use customers on an interruptible rate program, limiting service to these customers in periods of peak demand.

the utility's *peak demand* for electricity for its customers. Once consumer demand is identified, the commission is then charged with establishing an appropriate *reserve margin* for the utility (*i.e.,* the amount of capacity needed in excess of peak demand to accommodate unforeseeable events). Any capacity which is available to a utility, yet in excess of its peak demand and its reserve margin, is considered "excess electric generating capacity." [9] As previously noted, excess generating capacity costs, whether direct or indirect, are not chargeable to a public utility's customers. Iowa Code § 476.53 (1983). Excess generating capacity is not considered "used or useful" for the purpose of ratemaking proceedings.

In order to determine what portion of a utility's investment in generating capacity is "excess," the commission must affix a value to all or part of the utility's capacity. Then the commission can determine the utility's "net investment in excess generating capacity."

■ With respect to OCA's first complaint, that the commission overstated the company's actual peak demand of 632.7 megawatts by adding 37 megawatts it saved on conservation programs, the commission's ruling made clear that to refuse to inflate the peak would "encourage poor management practices" by utilities. The commission's decision on this issue attempted to encourage participation in its peak load and interruptible load programs, and comported with its 1982 commitment not to "unfairly penalize the utility which increases its reserve capacity by persuading its customers to reduce peak energy demand through the notification plan required by these rules." *Re Customer Notification of Approaching Peak Demand,* Docket No. RMU–82–14, at 2 (Iowa S.C.C. 1982). The commission's inclusion of these megawatts in petitioner's peak demand was well within its broad discretion and supported by substantial evidence in the record.

■ OCA's second complaint, that the commission arbitrarily set Iowa-Illinois' reserve margin at an excessive rate, is also without merit. An agency is free to exercise its expertise within a "reasonable range of informed discretion." *Peoples Memorial Hosp. v. Iowa Civil Rights Comm'n,* 322 N.W.2d 87, 92 (Iowa 1982). In determining Iowa-Illinois' reserve margin the commission was confronted with a range of reasonable choices. The company urged a margin from twenty-six to forty-two percent, while OCA advocated a fifteen percent margin. The commission selected an appropriate reserve margin within that range.

■ If it set Iowa-Illinois' reserve margin too low the commission feared it might "discourage economic development" in the company's service area and "jeopardize the reliability of service." Conversely, if it set the margin too high the commission feared Iowa-Illinois' customers might "pay too much for an insignificant increase in the reliability of service." Exercising its expertise and broad discretion under Iowa Code section 17A.14(5), the commission appropriately balanced the conflicting interests of consumers and investors to arrive at a just and reasonable reserve margin.

■ When deciding an issue within its range of expertise, an administrative agency may select a middle ground within the zone of reasonableness. *Federal Power Comm'n v. Conway Corp.,* 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626, 633 (1976). The district court properly refused to interfere with the agency action.

■ With respect to OCA's third contention, that the commission understated Iowa-Illinois' available generating capacity by failing to include 100 megawatts of electricity sold on contract to Union Electric Company, OCA appears to misapprehend the nature of the agreement between the parties. OCA argues that, because the thirteen week contract was revocable by Iowa-Illinois (in order to meet unforeseen

---

**9.** Iowa Code § 476.53 defines excess electric generating capacity as that portion of a utility's output which exceeds the amount reasonably necessary to provide adequate and reliable service to its customers.

causes), setting a purchase rate at "66% of the normal rate," its 100 megawatts of capacity should have been deemed "available" to Iowa-Illinois.

The district court correctly concluded that the valid agreement between Iowa-Illinois and Union Electric Company effectively reduced the capacity available to Iowa-Illinois during its peak demand period by 100 megawatts. The contract and its purchase price were the result of arms-length negotiations between the parties. The agreed upon purchase price, though perhaps relevant to management efficiency, is not relevant to excess capacity calculations. Only by *presuming* an unforeseeable breach of this apparently valid and enforceable contract could the commission have deemed the electricity sold to Union Electric "available" to Iowa-Illinois. The commission had no reason to make such a presumption and acted well within its discretion in offsetting Iowa-Illinois' available capacity by amounts of electricity sold on contract.

▮ OCA's final challenge to the commission's excess capacity calculation, that the agency undervalued Iowa-Illinois' investment in capacity by failing to utilize a "unit-specific" approach, also fails. OCA would have the commission adjust excess capacity in a plant-specific manner, considering the most recent additions to a utility's capacity the sole cause of excess. Under this approach the commission would be required to disallow a return on specific investments which cause a utility to generate excess capacity. This would result in the largest possible adjustment in a utility's revenue requirement because the most recent construction projects tend to incur the highest capital costs.

It was not error to base the excess capacity adjustment on the company's total capacity.

▮ D. OCA contends the district court erred in failing to recognize that a "straight-line depreciation deduction" should have been employed to calculate Iowa-Illinois' federal income tax liability.

According to OCA Iowa-Illinois should compute its federal tax deferral at a rate of 41.63% of the difference between the accelerated depreciation deduction it actually takes and the straight-line depreciation deduction it would otherwise take. Although the commission agreed with OCA's position at trial,[10] the district court—in reliance upon a letter ruling of the Internal Revenue Service [IRS]—disagreed. In the opinion of the IRS and the district court, Iowa-Illinois' federal income tax deferrals must be calculated at the statutory rate of forty-six percent, or else the utility could be deprived of its accelerated cost recovery deduction and the tax advantages accompanying accelerated depreciation.

Iowa-Illinois reduces its current federal income tax liability each year by deducting accelerated depreciation expenses on capital investments. By taking advantage of a "normalization" method of accounting and utilizing accelerated depreciation, the company pays less in federal income taxes each year than it would pay under a straight-line depreciation schedule. Under this scheme the company is required each year to credit a "reserve for deferred federal income taxes" by the amount which it saves as the result of accelerated depreciation. Amounts "deferred" are added to the company's "current taxes payable" and are charged off to its customers, although the actual funds saved may be used for any corporate purpose.

On this appeal the parties disagree about the appropriate method of calculating Iowa-Illinois' deferred federal income tax liability. OCA contends federal law permits deduction of state income taxes which are calculated using straight-line depreciation before calculating deferred federal taxes. According to OCA, Iowa-Illinois' deferred tax (representing the difference between its federal liability under a straight-line method and its federal liability under an accelerated method) should only be calculated after deducting its state income tax liability (calculated with a straight-line depreciation deduction). The result of these

10. The respondent commission subsequently reversed its position and accepted the reasoning of the Internal Revenue Service and the district court on this issue.

calculations, OCA asserts, would be a deferred tax to Iowa-Illinois representing 41.63% of the difference between its federal income tax liability under a straight-line depreciation method and its federal income tax liability under an accelerated depreciation method.

Iowa-Illinois disagrees, arguing that its federal income tax deferral must be calculated at the statutory rate of 46%, rather than at OCA's effective rate of 41.63%. According to Iowa-Illinois, OCA's proposal would violate sections 167(1) and 168(e)(3) of the Internal Revenue Code (IRC) and its accompanying treasury regulations, and was properly rejected by the district court. In Iowa-Illinois' opinion, the IRS's interpretation of the IRC and other federal tax laws should be paid deference by state courts, particularly where—as here—a valid IRS letter ruling has informed parties that their use of accelerated depreciation and accelerated cost recovery could be terminated if the agency's interpretation of the IRC is not upheld.

We think the commission and district court correctly deferred to a statutory interpretation of federal law by a federal agency. As the commission correctly noted, the loss of accelerated depreciation and accelerated cost recovery by Iowa utilities "could be harmful to Iowa-Illinois and its ratepayers, and that harm could substantially outweigh any short-term benefit to be gained by computing the deferral of taxes at the 41.63% rate."

V. OCA's final assignment on its appeal is a claim that the district court exceeded its authority by granting Iowa-Illinois a posttrial stay order, permitting it to increase its rates, pending appeal, to a level $7.2 million higher than that authorized by the commission and $2 million higher than the increase originally allowed by the dis-

trict court. OCA contends Iowa Code section 476.13(3) explicitly limits rate collections pending appeal to the higher of either the interim or the final rate.

The district court's stay order allowed Iowa-Illinois to collect, subject to refund, monies needed by the utility to prevent the commission's tax rulings from becoming final.[11] As previously noted, if the commission's tax adjustments—which it later repudiated—became final, and the revenues associated with them were no longer collectible from consumers, then Iowa-Illinois would likely have been deprived of its right to claim accelerated depreciation, accelerated cost recovery, and a job development investment tax credit. Because the district court was persuaded that "irreparable harm" would flow from depriving Iowa-Illinois of these tax benefits on the basis of several seemingly erroneous commission rulings, it entered the stay order permitting the utility to collect rates necessary to satisfy the higher of its disputed tax obligations.

We think the district court's issuance of a stay order, subject to refund, was well within its statutory discretion and necessary to prevent "irreparable harm."[12]

There is no merit in OCA's final assignment.

Tax costs sixty percent to Iowa-Illinois, thirty percent to OCA, and ten percent to the commission.

AFFIRMED ON ALL APPEALS.

All Justices concur except REYNOLDSON, C.J., who takes no part.

---

11. In addition to the previously discussed ruling of the commission on Iowa-Illinois' tax deferral, the agency made another ruling—also challenged but later settled—on Iowa-Illinois' tax liability for an "interest synchronization adjustment."

12. Iowa Code § 476.13(3), as the district court correctly held, does not apply to this case because petitioner's application for a rate increase was filed before July 1, 1983 (the effective date

of the statute). The predecessor statute to § 476.13(3), Iowa Code § 476.10, was no bar because it merely authorized but did not require the continuation of existing rates pending appeal. At the time § 476.10 was enacted, Iowa utilities were allowed to place their entire requested rate increases into effect by merely posting a bond during the pendency of commission proceedings and appeals.