**OFFICE OF CONSUMER ADVOCATE, Appellant,**

v.

**IOWA STATE COMMERCE COMMISSION, Appellee,**

and

**Iowa Southern Utilities Company, Intervenor–Appellant.**

No. 87–1626.

Supreme Court of Iowa.

Nov. 23, 1988.

James R. Maret, Consumer Advocate, and Ronald C. Polle and Ben Stead, Des Moines, for Office of Consumer Advocate.

Herschel G. Langdon and Ross A. Walters of Herrick, Langdon & Langdon, Des Moines, and Stephen W. Southwick, Centerville, for Iowa Southern Utilities Co.

Susan Allender, Gen. Counsel, and Allan Kniep, Asst. Gen. Counsel, for Iowa Utilities Bd.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and NEUMAN, JJ.

LARSON, Justice.

Iowa Southern Utilities filed an application for an increase in its electric rates, and the Iowa State Commerce Commission (now known as the Iowa Utilities Board) began proceedings to process the application. *See* Iowa Code ch. 476. The Office of Consumer Advocate (OCA), acting under Iowa Code section 475A.2 (1985), resisted the application and further proposed that Iowa Southern's rates be *de*creased. A hearing examiner rejected Iowa Southern's proposed rate increase and rejected several of the downward adjustments requested by OCA. Both parties appealed to the board. The board denied Iowa Southern's rate increase and denied portions of OCA's request for a rate reduction. Iowa Southern and OCA separately petitioned for judicial review, and the cases were consolidated for hearing. The district court affirmed in part, reversed in part, and ordered the case remanded to the board.

The board, OCA, and Iowa Southern have all appealed. On appeal, only OCA's request for downward adjustments of the rates is at issue; Iowa Southern has not appealed the denial of its rate increase.

We affirm in part, reverse in part, and remand.

At issue here is the board's rate-making function: the application of a prescribed rate of return to the utility's "rate base" to determine customers' rates. A utility's rate base "is essentially the net book value of the utility's plant considered used and useful in dispensing service plus some reasonable allowance for working capital requirements, and may include any new investment to be undertaken by the utility." R. Morin, *Utilities' Cost of Capital* 5 (1984). It "represents the total investment in property, used and useful at time of the rate inquiry, in rendering a designated utility service." *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 588 (Iowa 1971).

Computation of the rate base "is the most widely disputed legal issue in the history of American public utility regulation." J. Bonbright, *Principles of Public Utility Rates* 159 (1969) [hereinafter Bonbright]. Calculation of the rate base is the first step in calculating the amount which is available for distribution to the utility's investors. P. Garfield & W. Lovejoy, *Public Utility Economics* 116 (1964) [hereinafter Garfield & Lovejoy]. The second step is multiplying the rate base by a percentage called the "rate of return." *Davenport Water*, 190 N.W.2d at 588. (In the present case, the rate of return is not being contested.)

■ Rate-making is a legislative function, *Davenport Water*, 190 N.W.2d at 590, and public policy weighs on both sides of the process. The state has an interest in securing reasonable rates for its citizens, *see, e.g.,* Iowa Code § 476.8 (1985) (rates for electricity and gas "shall be reasonable and just"), and the burden of proving that the rates are reasonable and just is on the utility company. Iowa Code § 476.4; 73B C.J.S. *Public Utilities* § 23, at 182 (1983). On the other hand, one of the primary functions of the rate system is to provide for producer motivation and capital-attraction for the utility company, Bonbright at 49, and we have said that due process requires a fair return on utilities' invest-

ments. *Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 347 N.W. 2d 423, 427 (Iowa 1984); *Davenport Water*, 190 N.W.2d at 588.

■ In a rate-making procedure, OCA is charged with the representation of utility customers in attempting to secure just and reasonable rates. *See* Iowa Code § 475A.2. One concern is that the customers' money not be used in the rate base in such a way as to inure to the benefit of the utility investors, who made no actual contribution to it. Because of this, customer-contributed capital has usually been excluded from the rate base. This is for good reason, as the following articulates:

Customers' contributions, as they are called, and also customers' deposits and noninterest-bearing advances, are generally excluded from the rate base. The guiding principle here is that customers should not be required both to provide the utility with capital and to pay a return on the net value of such amounts. Alternatively, the public utility property that originates from customers' contributions is regarded as having no cost to the company for rate-base purposes. The fact that the utility may have title to such property is generally not controlling. Very few cases have held to the contrary.

Garfield & Lovejoy at 72.

The general rule of noninclusion of consumer-generated capital is widely accepted, 64 Am.Jur.2d *Public Utilities* § 140, at 670 (1972); 73B C.J.S. *Public Utilities* § 24, at 187, and the Iowa rule is in accord. *See, e.g., Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n*, 359 N.W.2d 491, 499 (Iowa 1984); *Davenport Water*, 190 N.W.2d at 607.

The first two issues in this case concern alleged inclusion of customer-contributed capital, the first in the form of a reserve for self-insurance and the second a reserve for uncollectible accounts. OCA contends that, once a fund is shown to be customer-contributed, the game is over. The fund must be deleted from the rate base. Iowa Southern and the board, on the other hand, argue that the general rule is only that—a

general rule—and the board, in the exercise of its authority, may nevertheless include such funds in the rate base. They contend that this case presents such a situation.

As a foreword to our discussion of rate base determination, we point out that, because of the great deference given to agencies in such cases, most disputes are won or lost at the agency level. *See Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 412 N.W.2d 600, 604 (Iowa 1987). In reviewing an agency's decision, we are not free to decide if it acted wisely or not. *Id.*

In the area of public utility regulation, courts' deference to agency expertise is particularly appropriate. It is a highly technical area, and courts generally will defer to the agency's decision if it is "within the zone of reasonableness." *See Federal Power Comm'n v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626, 633 (1976) (*rate* of return decision); *Iowa–Illinois Gas & Elec. Co.*, 412 N.W.2d at 610 (rate base decision).

Rate-making is not an exact science, and "[s]tatutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high." *Federal Power Comm'n*, 426 U.S. at 278, 96 S.Ct. at 2004, 48 L.Ed.2d at 633 (quoting *Montana–Dakota Utils. Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912, 919 (1951)).

The complexity of rate base decisions is apparent from an examination of the wide range of considerations which go into it. As already noted, the parties here argued over components of the rate base such as working capital, insurance reserves, and reserves for uncollectibles.

Here, the complexity of rate base calculation is further illustrated by the board's resolution of issues concerning inventory valuation. The value of coal supplies, for example, is properly a part of the rate base. But, in this case, Iowa Southern's coal inventory fluctuated widely because one plant was supplied with coal by barges. The amount of inventory therefore turned on whether it was valued during the barge season when the stockpile would be large, or at other times when it would be partially depleted. It is apparent from this example, and from the issues involving other components of the rate base, why the board's rate base calculation need only fall within a zone of reasonableness. Even with the board's expertise in such matters, it is a difficult process. It is certainly an area in which courts will tread lightly.

### I. *The Reserve for Injuries and Damages.*

Iowa Southern maintains a reserve for payment of injury and damage claims, generally referred to as a fund for self-insurance. OCA alleges the district court erred in affirming the board's inclusion of this fund in Iowa Southern's rate base. It bases its contention on four grounds: (1) that this court, in *Davenport Water*, 190 N.W.2d at 607, decided as a matter of law that a utility's investors may not earn a return on customer-created capital; (2) that the board's decision to the contrary was unsupported by substantial evidence; (3) that the decision was arbitrary and capricious; and (4) that the decision was contrary to Iowa Code section 476.52 (1987).

A. In *Davenport Water*, the question was whether working capital should be added to the rate base. In holding that it should not, we accepted the board's reasoning that the

> equitable and controlling consideration is whether investors or ratepayers do in fact supply the capital to Company (Utility). To the extent that the ratepayers are the contributors, they are entitled to have that contribution taken into account. Therefore, we find that no allowance for either component of working capital should be included in the rate base.

190 N.W.2d at 607. We concluded that, "[h]ad Commission held other than it did, Utility's customers would be unreasonably required to pay a return on funds already

supplied by them in the form of prepaid taxes." *Id.*

*Davenport Water* echoes the general rule of exclusion of customer-contributed capital—a rule which the board has quite consistently followed. *See Northwestern Bell,* 359 N.W.2d at 499 (commission has long-standing policy prohibiting shareholders from earning a return on capital contributed by ratepayers); *In re Iowa Power & Light Co.,* 51 P.U.R.4th 405, 414 (ISCC 1983); *In re Interstate Power Co.,* ISCC Docket No. R.P.U.-83-27, Proposed Order at 23-24, *aff'd.* May 16, 1984; *In re Iowa-Illinois Gas & Elec. Co.,* ISCC Docket No. U-483, "Order on Rehearing ..." at 13 (June 1976).

This general rule is not based on any statute, however, and as the OCA concedes, the board has recently modified its policy by adopting an exception for self-insurance reserves. *See* Docket No. R.P.U.-8-19, R.P.U.-30-29, and R.P.U.-83-22. The board explained its reasons for this exception in Docket No. R.P.U.-80-19 and R.P.U.-80-29, stating:

> We view the self-insurance reserve as a legitimate "expenditure" which may be somewhat less costly than purchasing insurance from a private insurance carrier, a cost that would be borne by the ratepayer. Exclusion of the self-insurance reserves from the rate base would penalize the Company for deciding to self-insure, a practice which costs the customers less than outside coverage. Company's use of the reserves for other corporate purposes is limited given its need to maintain that capital in a liquid position. The reserve account, which contains only as much capital as is needed to cover liability for a known contingency and which is kept for that specific corporate purpose, should not be used as an offset to the rate base.

■ The question then becomes whether the board has the authority to make such policy changes in light of the rule set forth in *Davenport Water.* Our review of a final agency action is at law. *Wiese v. Iowa Dep't of Job Serv.,* 389 N.W.2d 676, 681 (Iowa 1986). Unless the evidence would compel the board to rule in a particular way as a matter of law, the court must allow it to make the decision the legislature vested in it. *Johnston v. Iowa Real Estate Comm'n,* 344 N.W.2d 236, 240 (Iowa 1984). It is within the board's statutory mandate to make sure that rate base decisions are reasonable and just after considering "all factors relating to value." Iowa Code § 476.8. Because of Iowa Southern's policy of self-insurance, there was evidence which showed that the actual cost to ratepayers for claim protection over a ten-year period was $147,500 as opposed to the $1.5 million it would have paid for insurance premiums.

OCA contends that, despite the savings to consumers, Iowa Southern can essentially use this customer-provided capital for an "interest-free loan," which is unlawful under *Davenport Water.* The board responds that this reserve must be kept liquid and therefore cannot be considered an interest-free loan.

■ We defer to an agency's expertise, and the burden rests on OCA to show that the board's policy choice here was unreasonable. *See Iowa-Illinois Gas & Elec.,* 412 N.W.2d at 604; 64 Am.Jur.2d *Public Utilities* § 127, at 653 (1972). In light of the ultimate savings to consumers, the board did not act improperly under the "just and reasonable" standard. *Davenport Water* merely stated the general rule and applied it in that case. In this case, as it had in earlier ones, the board applied an exception to the *Davenport Water* rule—a decision which OCA has not demonstrated to be unreasonable.

[6] B. Agency fact-finding is binding on courts if it is supported by substantial evidence when the record is viewed as a whole. *Norland v. Iowa Dep't of Job Serv.,* 412 N.W.2d 904, 913 (Iowa 1987). OCA contends that the board's decision is not supported by substantial evidence, because its decision hinged on the finding that exclusion of these reserves from the rate base would "penalize" the company, and the record is devoid of evidence of such a penalty. The board argues that expert testimony on the savings resulting from

self-insurance is substantial evidence to uphold the board's decision.

The agency's findings of fact must be viewed on the whole record. *Varied Enters., Inc. v. Sumner,* 353 N.W.2d 407, 409 (Iowa 1984). Here, the hearing examiner's proposed decision points out that, besides not wishing to "penalize" Iowa Southern's establishment of a self-insurance fund, inclusion of the self-insurance reserves in the rate base was a legitimate expenditure by Iowa Southern because it saved money.

We do not believe, as OCA seems to suggest, that Iowa Southern was required to furnish evidence of a penalty in order to be consistent with the board's decision that failure to include the self-insurance fund would penalize the company. We believe the "penalty" to which the board's decision referred simply means that Iowa Southern would not get all that to which it was legally entitled if the reserve for self-insurance were to be excluded.

Substantial evidence need only be that which a reasonable mind could accept as adequate, *Meads v. Iowa Dep't of Social Servs.,* 366 N.W.2d 555, 558 (Iowa 1985), and we believe the board's finding is sufficiently supported here.

C. OCA argues that the board's decision is arbitrary and capricious, and therefore subject to reversal under Iowa Code section 17A.19(8)(g), because: (1) it awards a windfall to the company; (2) it does not minimize ratepayers' costs because much of the savings is retained by the company; and (3) it is the company's duty to operate as efficiently as possible, and departure from the *Davenport Water* rule is neither explained nor reasonable.

"Arbitrary" and "capricious" are practically synonymous; both mean an agency decision taken without regard to law or the facts of the case. *See Norland,* 412 N.W.2d at 912; *Churchill Truck Lines, Inc. v. Transportation Regulation Bd.,* 274 N.W.2d 295, 299 (Iowa 1979). As previously discussed, there is nothing "illegal" per se in including these reserves in the rate base, and the board had a rational basis for inclusion of the fund in the rate base: to encourage self-insurance as a means of cutting customer costs. The board's exception to the general rule for self-insurance reserves does not make the board's decision "without regard to law or consideration of the facts."

D. OCA contends that the board's decision violates Iowa Code section 476.52 which provides:

It is the policy of this state that a public utility shall operate in an efficient manner. If the board determines in the course of a proceeding conducted under section 476.3 or 476.6 that a utility is operating in an inefficient manner, or is not exercising ordinary, prudent management, or in comparison with other utilities in the state the board determines that the utility is performing in a less beneficial manner than other utilities, the board may reduce the level of profit or adjust the revenue requirement for the utility to the extent that the board believes appropriate to provide incentive to the utility to correct its inefficient operation. If the board determines in the course of a proceeding conducted under section 476.3 or 476.6 that a utility is operating in such an extraordinarily efficient manner that tangible financial benefits result to the ratepayer, the board may increase the level of profit or adjust the revenue requirement for the utility. The board shall adopt rules for determining the level of profit or the revenue requirement adjustment that would be appropriate.

OCA argues that, under this statute, the board may reward a utility only if it is operating in an "extraordinarily efficient" manner. Because most companies do self-insure, self-insuring has become ordinary, and OCA contends it would be unlawful to reward for "ordinary" care. OCA further argues that, under the statute, Iowa Southern should not only be denied a profit on this component, but in fact should be penalized if it had not exercised the "ordinary care" of self-insuring. *See* Iowa Code § 476.52 (board has authority to penalize

utility company not providing just and reasonable rates).

Considerable discretion is vested in the board, as evidenced by the statute's provision that, "if the Board determines" that there is extraordinary efficiency or inefficiency, it may reward or punish accordingly. Viewing the record as a whole, the board could have properly decided that, by charging the customers $147,500 for self-insuring as opposed to $1.5 million for insurance premiums, Iowa Southern had been extraordinarily efficient and therefore entitled to a reward. In any event, this decision was within the proper authority of the board.

## II. *The Reserve for Uncollectibles.*

Iowa Southern maintained a reserve for uncollectible accounts, which it included in its proposed rate base. OCA contended that the fund should be removed from the base, because it was customer-generated. The hearing examiner allowed the fund to remain, and the board adopted the hearing examiner's recommendations.

On judicial review, the district court reversed on the basis that there was "no significant dispute" that the fund was customer-created and Iowa Southern had not shown any reason why it should be exempted from the general rule of *Davenport Water.* It concluded that the reserve must be excluded from the rate base and ordered the board to recompute the rate base by deleting the reserve for uncollectibles. Iowa Southern and the board appealed this part of the judgment.

Iowa Southern and the board argue that the court erred in concluding that no dispute existed as to whether the fund was in fact customer-created and erred in failing to defer to the board's expertise on the issue. They contend that, if the board erred on this issue, the district court should have remanded it to the board for further proceedings; it should not have decided the question of whether this component should remain in the rate base.

The board's hearing examiner, in his proposed order, said this concerning the bad debt reserve:

OCA next proposes an adjustment to working capital in the amount of approximately $329,000. This is the thirteen-month average of the amount of the reserve for uncollectibles. OCA states this is customer-contributed capital and Company should not earn a return on this amount. Company argues that an allowance has been made in the lead/lag study and that if this further adjustment is made Company would be penalized. We do not believe Company has properly analyzed this matter and we disagree with its position with respect to the lead/lag study. Neither party cites any authority in support of its position with respect to this reserve. We must therefore assume that this Commission in reviewing rate case proceedings has approved reserves for bad debts or uncollectibles as a part of rate base and lacking any authority for its rejection we shall disapprove OCA's proposal [to reduce the base].

This report by the hearing examiner was adopted by the board as its final order.

The gist of this ruling is that, because no authorities were cited to the contrary, "[w]e must ... assume that [the board] ... has approved reserves for bad debts or uncollectibles as a part of rate base ...." It appears that Iowa Southern won the issue by default, because the board "lack[ed] any authority for its rejection."

The district court reversed the board on this issue, reasoning that (1) there was no dispute that the reserve for uncollectibles was customer-created; (2) Iowa Southern had the burden to show the reasonableness of including this reserve in its rate base; and (3) because Iowa Southern had failed to show any basis for making an exception to the general rule of noninclusion of customer-generated capital in the rate base, the reserve for uncollectibles could not be included. In effect, it argues that any loss by "default" on this question should be suffered by Iowa Southern, not the customers, because Iowa Southern had the burden of proving reasonableness of the rates. *See* Iowa Code § 476.4.

Based largely on these observations, the district court held that the board had failed

to follow the general rule of exclusion of customer-contributed capital, thereby acting arbitrarily and capriciously, that the decision was without substantial evidence in the record, and that the effect of the board's ruling was to approve a rate which was unjust and unreasonable, in violation of Iowa Code section 476.8.

■ On judicial review of administrative action, a court has no original authority to declare parties' rights; it should remand for findings if an agency's ruling does not disclose a sound factual or legal basis for its decision. *See Wiese*, 389 N.W. 2d at 681; *Des Moines Indep. Community School Dist. v. Department of Job Serv.*, 376 N.W.2d 605, 610 (Iowa 1985); *Taylor v. Iowa Dep't of Job Serv.*, 362 N.W.2d 534, 537 (Iowa 1985).

■ If it had been agreed that the reserves were in fact customer-contributed capital, and further that no basis for an exception to the general rule had been established, the district court might properly have corrected the board's ruling by applying the general rule of *Davenport Water. See Mary v. Iowa Dep't of Transp.*, 382 N.W.2d 128, 131 (Iowa 1986) (in reviewing agency action, district court functions in appellate capacity to correct errors of law by agency). That is, however, not the case here; the source of this fund, investor or customer, was disputed by the parties. The board should have decided the issue on the basis of the evidence presented to it. Contrary to the conclusion of the district court, we do not believe this issue should have been decided by the court as a matter of law.

On the other hand, we believe the board erred in its application of the law by assuming that, because OCA had not cited any authority to the contrary, the reserve for uncollectibles would be allowed in the rate base, even if it was customer-created.

■ Iowa Southern had the burden to prove the reasonableness of its rates. Iowa Code § 476.4. Allowing Iowa Southern to prevail on this issue on the ground that the opponents of the proposed rate had failed to produce support for their posi-tion is inconsistent with that rule. Furthermore, if this fund was in fact customer-contributed, it should not have been allowed to remain in the rate base unless an exception to the general rule of exclusion was presented by Iowa Southern. The board's decision, that the fund should remain in the rate base because OCA did not show reasons to exclude it, turns the rule of *Davenport Water* on its head.

We believe the board should make a determination as to whether the fund was customer-contributed and, if so, whether sufficient evidence existed for it to make an exception to the general rule of noninclusion. This, again, is a matter for board expertise. We reverse and remand for a determination on this issue without directing the board either to include or exclude the reserve for uncollectibles.

### III. *The Lead–Lag Study.*

■ Computation of working capital is a significant part of a rate base determination. Working capital is often made up of contributions by both the utility company's investors and its ratepayers. To determine how this component is to be allocated for rate base purposes, a process called a "lead-lag" study is used.

"Lead" time is the average time between the company's receipt of a bill from a supplier and the company's payment of the bill. "Lag" time is the average number of days between the utility's billing of its customers and its receipt of payment. We have said this regarding lead-lag studies:

> Utilities must of course maintain cash working capital for use in operations. A question exists as to who supplied that capital in [the utility's] operations, the investors or the ratepayers. To answer such questions, "lead-lag" studies are conducted. If a positive value results, the investors are supplying working capital, while a negative value shows that the ratepayers are supplying working capital.

*Northwestern Bell Tel. Co. v. Iowa State Commerce Comm'n*, 359 N.W.2d 491, 499 (Iowa 1984).

In the present case, the parties have agreed on the "lead" days but they disagree on the "lag" days—the number of days from billing to collections. Iowa Southern seeks a higher number of days, while OCA seeks a lower number. The board's hearing examiner set the lag time at 21 days, but on the administrative appeal, the board increased it to 26.9 days. OCA contends, and the district court held, that the board's decision was arbitrary and capricious because it was made without consideration of the facts in the case and without a sufficiently detailed explanation. The court also found there was not sufficient evidence to support the decision. The district court remanded the case for further proceedings by the board.

The board's discussion of the lead-lag issue was very brief, and we set it out in its entirety:

On page 40 of his order the hearing examiner found that Company's billing to collection period should be reduced to twenty-one days. Several recent actions by the legislature, including the winter disconnection moratorium and the increased billing period, will logically serve to delay collections. Given these conditions it is unlikely Company will be able to reduce its average lag days. We find that Company's allowance of 26.9 days for billing to collection should be accepted.

The district court held that the board failed to explain the rationale for its resolution of the lead-lag issue as set out above. Specifically, the court held the board had failed to show what impact the "several recent actions by the legislature," as mentioned in the order, had on the lead-lag issue.

Iowa Southern contends, and we concur, that the legislative "actions" referred to are sections 476.20(3) and 476.54 (1985), which impact on utility companies' collections by prohibiting disconnections of certain customers from November through April 1 and also prohibit payment charges within twenty days from the date of billing. Both statutes, Iowa Southern claims, are disincentives to earlier payment, and the board's decision setting the lag time accordingly was thereby justified.

The district court held that the board's decision had rejected the only facts found by the hearing examiner supporting the final decision and the board made no "reasoned analysis" to support its conclusion. We disagree. While the board's discussion was brief and did not discuss the evidence in detail, it apparently concluded that Iowa Southern's evidence supporting a longer lag time, coupled with the recent legislation, were sufficient to support the decision. We cannot say that decision was arbitrary or capricious.

OCA also contends, and the district court agreed, that the board's decision was unsupported by substantial evidence. OCA contends that Iowa Southern's 26.9-day lag period resulted from a study which was deficient because it (1) included no industrial customers, and (2) had conceptual problems. Iowa Southern argues that the board's decision was supported by substantial evidence and that the district court erred in holding otherwise.

While we agree that the board gave the issue rather summary treatment and that there is evidence in the record which might have supported another conclusion, we must examine the entire record to determine whether the board violated its duty to consider all relevant factors in arriving at its decision. *See* Iowa Code § 17A.4(1)(b); *Iowa Citizen/Labor Energy Coalition Inc. v. Iowa State Commerce Comm'n*, 335 N.W.2d 178, 181 (Iowa 1983). On the whole record, it is clear that there was evidence, notably in the form of accounting testimony, to support the board's lag-time determination.

Having concluded that the board's decision was neither arbitrary nor capricious and that it was supported by substantial evidence, we defer to the board's expertise in making the actual determination on the lead-lag issue.

In conclusion, we affirm the district court and the board on division I, reverse the district court and the board on division II, and reverse the district court and affirm

the board on division III. We remand to the board on division II to determine to what extent, if any, the fund for uncollectibles is customer-contributed. To the extent that it is customer-contributed, the board shall determine whether an exception to the general rule of noninclusion, under *Davenport Water,* should be adopted under the facts of the case.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.