OFFICE OF CONSUMER ADVOCATE, CONSUMER ADVOCATE DIVISION, DEPARTMENT OF JUSTICE, STATE OF IOWA, Appellant,

v.

UTILITIES BOARD, UTILITIES DIVISION, DEPARTMENT OF COMMERCE, STATE OF IOWA, Appellee,

v.

IOWA ELECTRIC LIGHT AND POWER COMPANY, Appellee.

No. 88–1575.

Supreme Court of Iowa.

Dec. 20, 1989.

James R. Maret, Consumer Advocate, Ben Stead, and William A. Haas, Dept. of Justice, for appellant.

Susan Allender, Gen. Counsel, and Alan Kniep, Util.Div., Dept. of Commerce, for appellee Utilities Bd.

Thomas J. Pitner and Jonathan M. Rogoff, Cedar Rapids, for appellee Iowa Elec. Light and Power Co.

HARRIS, Justice.

Iowa Electric Light and Power Company (the utility) undertook three new electrical generating projects. They were deemed prudent investments at the time but events later proved otherwise so they were abandoned without going into service. The utility board permitted the utility to amortize, over a ten-year period, the actual amounts spent toward developing the projects before they were abandoned, but it did not allow for any recovery of the costs of making those investments. The consumer advocate and the utility both challenge portions of this determination. A separate question involves allocating funds for decommissioning costs of another plant. The district court agreed with the utility board's determinations and so do we.

In 1979 the utility entered an agreement with two other utilities to construct the projects, principally a 650 megawatt facility planned for Guthrie County. In December 1979, the partners filed an application with the board (at that time called the commerce commission) to proceed with the projects. Although actual construction was never commenced, upwards of $16.5 million was expended in plan development. Operation was to begin in 1984. Projections on the best information then available indicated greatly expanded future demand for electrical energy. Hindsight now tells us otherwise. But the hindsight we enjoy was not then available to the planners.

It was eminently reasonable for the utility, acting on the best current information, to proceed in such a way as to meet the anticipated electrical needs of the future. This they did. As matters developed, future events did not match the projections. It later became apparent there would be insufficient demand for the expanded generating facilities and construction of the projects was suspended September 27, 1984. The main project was canceled February 3, 1986; the other two projects had been canceled earlier.

The utility then filed proposed tariffs with the utility board seeking to recover both (a) the amount invested in the three abandoned projects and (b) a reasonable return on those invested costs. As mentioned, the utility board allowed recovery of the actual costs over a ten-year period but not any recovery for a reasonable profit on the amounts.

The district court on judicial review affirmed the action of the utility board. The consumer advocate appeals from the allowance of any recovery. The utility cross appeals from the disallowance of a reasonable return on the investments.

■ I. Our response to any challenge to a board determination inevitably begins with a reference to the law's strict "hands-off" policy on judicial review of agency action. Sound public policy demands that final agency determinations must be undisturbed when based on accurate application of legal principles, and when they are within the scope of expertise assigned to the agency. We have said:

Under the administrative law scheme nearly all disputes are won or lost at the agency level. Our review of agency action under Iowa Code section 17A.20 is carefully confined to the correction of errors of law. We apply the standards outlined in Iowa Code section 17A.19(8). The burden rests squarely on the challenger to show that an agency's policy choices were unreasonable; we defer readily to the agency's expertise. The [utility board's] rate-fixing power under Iowa Code chapter 476 is legislative in nature, and courts have no authority to determine whether the [board] acted "wisely" in adopting a particular policy.

*Iowa–Illinois Gas & Elec. v. Iowa State Commerce Comm'n,* 412 N.W.2d 600, 604 (Iowa 1987) (citations omitted).

The parties disagree, not only on the answers, but also on the nature of the questions in litigation. The board contends that complicated, highly technical questions are at issue. There are broad public policy ramifications in the allocation of conflicting claims and benefits of utilities and their ratepayers. The board sees the issues in dispute as peculiarly within its field of expertise.

Relying on its expertise, and the general principles of administrative law previously outlined, the board insists that its determinations should stand. The board sorted through a number of factors: cost to the rate-paying consumer; reasonable profit to the investors; and the public's interest in developing plans for future electrical needs. It was after considering these and other appropriate factors that the board reached a conclusion not entirely satisfactory to either party when it allowed recovery *of* but not *on* the funds invested in the abandoned projects. The board contends it functioned as it should have and acted well within the parameters of the administrative law scheme and in accordance with all legal mandates.

The consumer advocate, on the other hand, sees the issue as a legal one. The deference courts owe to administrative tri-

bunals, broad as it is, stops where legal rules begin. The consumer advocate insists the board misapplied a fundamental rule: the "used or useful" rule, an area of law which the courts have visited with some frequency. We have traced the origin of the rule:

> The "used and useful" standard is derived from United State Supreme Court holdings that a utility is entitled to a reasonable return on the value of property used to render services, but "it is not entitled to have included any property not used or useful for that purpose."

*Iowa–Illinois Gas & Elec. v. Iowa State Commerce Comm'n*, 347 N.W.2d 423, 428 (Iowa 1984) (citing *Denver Union Stock Yard Co. v. United States*, 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469, 1476 (1938)).

The rule is based on the notion that, as economic captives, the consumers should pay only for the generating properties which are actually used or useful in rendering the services to them. *Iowa Planners Network v. Iowa State Commerce Comm'n*, 373 N.W.2d 106, 109 (Iowa 1985); *Iowa–Illinois Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 347 N.W.2d at 429. The consumer advocate argues that the matter comes down to selecting who should bear a useful economic risk. Should the risk be borne by the energy consumers or the corporate investors?

During the past decade a number of state courts have been confronted with the same issue. Abandonment was for the same reasons given here and likewise occurred before facilities ever went into operation. It seems that every state facing the problem has been confronted with the argument advanced by the consumer advocate; the used and useful rule seems well nigh universal. The rule appears most often in the form of a statute.

The overwhelming majority of the cases indicate that, although superficially it might seem appropriate, the "used or useful" rule has no proper place in the analysis. The cases flatly reject the notion that we confront a simple rule based on an obvious economic premise (investment risks should be assigned the same investors who would enjoy the advantage of profits). The economic premise goes without saying but does not fit into the analysis. *See e.g. People's Org. for Washington Energy Resources v. Washington Util. & Transp. Comm'n*, 104 Wash.2d 798, ——, 711 P.2d 319, 332 (1985). The most respected case, probably the one most widely cited, is *Attorney General v. Department of Public Utilities*, 390 Mass. 208, ——, 455 N.E.2d 414, 424 (1983) (statutory "used or useful" rule does not prohibit agency from allowing recovery of a company's prudent investment in plant reasonably abandoned before completion). *See also People's Org.*, 711 P.2d at 329–30 (used or useful statute applies only to rate base); *Wisconsin Pub. Serv. Corp. v. Public Serv. Comm'n of Wis.*, 109 Wis.2d 256, ——, 325 N.W.2d 867, 871 (1982) (reversing disallowance of recovery by agency as arbitrary and capricious). Other cases, often cited as minority cases to the contrary, are not at point. *See e.g. Barasch v. Pennsylvania Pub. Util. Comm'n*, 516 Pa. 142, ——, 532 A.2d 325, 331 (1987) (statute expressly prohibited amortization as well as inclusion in rate base); *Pacific Power & Light v. Public Serv. Comm'n of Wyo.*, 677 P.2d 799, 809 (Wyo.1984) (rate base case—disallows only costs incurred without prior approval). There does seem to be a small minority view to the contrary. *See Citizens Action Coalition of Indiana, Inc. v. Northern Ind. Pub. Serv. Co.*, 485 N.E.2d 610, 615 (Ind.1985).

The lesson of these cases is that the "used or useful" argument has more glitter than substantive application in cases of this kind. We ourselves have indicated the prohibition applies to the fixing of rate bases only. *See Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 432 N.W.2d 148, 151 (Iowa 1988).

From the consumer advocate's point of view the majority cases effectively negate a clear rule of law which is intended to defend rate-paying consumers. From that perspective the rule is of little or no practical advantage to consumers if a utility is not allowed to recover for unused facilities by way of rate base but can amor-

tize the same amount over ten years. The majority cases nevertheless perceive a crucial difference. These cases suggest that the used or useful rule cannot be applied outside rate base questions without doing violence to the whole scheme of public utility law. *See Peoples Org.*, 711 P.2d at 329 (Since the agency only allowed utility "to amortize abandoned plant costs, and did not include those costs within rate base or otherwise enable it to earn a return thereon, the 'used or useful' concept is not involved."). Whatever ultimate fallout in terms of net economic impact, the majority cases attest that the used or useful rule impedes agency action only in matters where a rate base is directly involved.

■ The rule did not prevent the agency from approving the amortization allowed here. The district court was correct in so holding.

■ II. The board disallowed the utility's requested allowance for funds used during construction (AFUDC) of the Guthrie facility. AFUDC is the cost of the funds used to construct a new plant. Allowance was refused because the board determined that "construction" could not begin until the board issued a requested certificate of public convenience, use, and necessity in accordance with Iowa Code section 476A.6 (1989).

The board had adopted, with some modifications, the federal energy regulatory commission's uniform system of accounts (USoA). 199 Iowa Admin.Code 16.2 *et seq.* (1989). The company contends the board's adopted version of USoA entitles it to the disallowed AFUDC.

The district court correctly rejected the contention. The matter turns on the meaning of the term "period of construction," as used in USoA as adopted by the board. 18 C.F.R. § 161.3(17) (1986). This definition was subject to conflicting testimony by the parties' expert witnesses. That board acted well within its scope of authority in adopting the interpretation of its rule as proposed by one expert witness.

■ III. A separate and unrelated issue involves an excess depreciation reserve of the Duane Arnold Energy Center (DAEC), an atomic energy facility which the utility placed in service in 1974. The plant was set up for depreciation over a twenty-eight-year period and was so treated for twelve years. When it filed this case the utility separately requested the board to allow a change in the plant service life from twenty-eight to thirty-six years.

The request was granted, resulting in a $21,709,000 depreciation reserve for the utility. This was because the first twelve years of the thirty-six-year service life had been reckoned on the basis of the shorter service life.

The utility proposed the $21.7 million of excess depreciation reserve be treated as an internal decommissioning fund for DAEC. This proposal was made on the basis of studies made for the utility in 1985. The studies projected extensive decommissioning expenses at the conclusion of the service life of an atomic energy facility.

The consumer advocate protested this proposed treatment of the excess reserve. The utility failed during the first twelve years to identify any part of the depreciation reserve as decommissioning costs. This failure, according to the consumer advocate, precludes the utility from ever recovering the portion of the decommissioning costs for that period. The argument is that the shareholders should bear the entire burden for the first 12/36 of the plant's decommissioning costs.

The board viewed depreciation and decommissioning as one combined issue. It allowed the utility's request because it determined that the ratepayers, during the entire thirty-six years, would thereby pay a close approximation of the correct amount needed to cover the total cost of building and removing the plant. The board could have reached a different determination. The district court nevertheless correctly held that the board acted within its authority in reaching it.

AFFIRMED ON BOTH APPEALS.

All justices concur except CARTER, J., who takes no part.