OFFICE OF CONSUMER ADVOCATE, CONSUMER ADVOCATE DIVISION, DEPARTMENT OF JUSTICE, STATE OF IOWA, Appellant,

v.

UTILITIES BOARD, UTILITIES DIVISION, DEPARTMENT OF COMMERCE, STATE OF IOWA, Appellee,

v.

UNION ELECTRIC COMPANY, Amsted Industries, Inc., et al., and City of Keokuk, Appellees.

No. 89–229.

Supreme Court of Iowa.

Feb. 21, 1990.

Rehearing Denied March 15, 1990.

James R. Maret, Consumer Advocate, Alexis K. Wodtke, and William A. Haas, Dept. of Justice, for appellant.

Susan Allender and Diane Munns, Utilities Div., Dept. of Commerce, for appellee Utilities Bd.

Paul Agathen, St. Louis, Mo., and Sheila K. Tipton and David J. Lynch, of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellee Union Elec. Co.

John E. Kultala, of Dickey, Smith, Kultala & McDonald, Keokuk, for appellees Amsted Industries Inc., et al.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, NEUMAN and ANDREASEN, JJ.

ANDREASEN, Justice.

Union Electric Company (Union) is a public utility furnishing electricity in Missouri, Illinois, and Iowa. In this appeal, we review a decision of the Utilities Board (board) granting Union's request for an increase in its Iowa electrical rates. Union sought the increase in rates to recover investments made in two nuclear power

plants—one which was completed and one which was cancelled.

Both plants were based on a standardized plan drawn up on behalf of Union and four other utilities in the early–1970's. Construction of "Callaway I" nuclear power plant began in 1976, and it was completed in December 1984. There were numerous construction delays. Construction of "Callaway II" never began. Rather, planning was suspended in February 1977, and the project was cancelled in October 1981.

Union filed its application for an electric rate increase with the board (then the Iowa State Commerce Commission) in April 1985. Union already had undertaken rate proceedings in other states. *See In re Union Elec. Co.*, 67 P.U.R.4th 218 (Ill. Commerce Comm'n 1985); *In re Union Elec. Co.*, 66 P.U.R.4th 202 (Mo. Pub. Serv. Comm'n 1985). Union's notice to its Iowa customers showed it was asking for a rate increase to be phased-in over five years, or, in the alternative, a single, full rate increase.

The Office of Consumer Advocate, the City of Keokuk, Amsted Industries, Inc., and others intervened. To resolve a number of contested issues, they entered into stipulations with Union. One stipulation provided that the board approve an extension of the ten-month deadline it operates under so that additional actual data could be collected on the operation of Callaway I. The board, however, refused to approve an extension of the deadline.

Another stipulation provided that the detailed report of the Missouri commission constituted a prima facie case for the disallowance of $284 million from the rate base and shifted to Union the burden of establishing the prudence of those expenditures. The board approved the stipulation, but later used a different method of determining the rate base. In a broad outline, the board determined (1) Union's notice to its customers was adequate; (2) the stipulation did not bind it to apply any particular method in arriving at a rate base; (3) the appropriate method resulted in a disallowance of the last ten months of the allowance for funds used during construction

(AFUDC) from the rate base; (4) Union did not delay its Iowa application unreasonably, entitling it to AFUDC after Callaway I was placed in service; (5) common costs for Callaway I and II should be included in the rate base as costs for Callaway I; (6) Union could recover the costs of Callaway II up to its cancellation in 1982; and (7) Iowa's share of the rate base should be determined according to a twelve-month coincident peak (12–CP) method.

On judicial review of agency action in the district court, the board's decision was upheld, with the following exceptions: (1) Union was not entitled to AFUDC after Callaway I was placed in service, (2) common costs for Callaway I and II could not be treated solely as costs of Callaway I, (3) Union could not recover costs of Callaway II after planning was suspended in 1977, and (4) the board should have used a four-month coincident peak method (4–CP) in determining Iowa's share of the rate base.

The Office of Consumer Advocate appealed the decision of the district court upholding the board's decision on the notice issue, the effect of the stipulation approved by the board, the extension of the ten-month deadline, and recovery of the costs of Callaway II. The board appealed the court's decision reversing the board on the allowance of AFUDC after Callaway I's in-service date, the transfer of common costs to Callaway I, the recovery of Callaway II costs after 1977, and the jurisdictional allocation method. Union appealed the court's decision upholding the board's disallowance of the last ten months of AFUDC.

Having reviewed all issues presented by the parties, we are inclined to uphold the board's decision in all respects except where it departed from the stipulation it approved. The decision of the district court is affirmed in part and reversed in part, and the matter is remanded to the board.

I. *Scope of Review.*

 When we review a rate-making decision of the utilities board, we review an agency adjudication based on "the unique

individual circumstances surrounding each utility." *Iowa Power & Light Co. v. Iowa State Commerce Comm'n*, 410 N.W.2d 236, 241 (Iowa 1987). *See* Iowa Code § 17A.2(2) (1989) (ratemakings proceed as "contested cases"). We review for errors of law or conclusions by the board unsupported by substantial evidence in the record made before the board when that record is viewed as a whole. *Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 428 N.W.2d 302, 304 (Iowa 1988). *See Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 419 N.W.2d 373, 374 (Iowa 1988). Our "hands-off" policy on judicial review recognizes "that final agency determinations must be undisturbed when based on accurate application of legal principles, and when they are within the scope of expertise assigned to the agency." *Office of Consumer Advocate v. Utilities Board*, 449 N.W.2d 383, 385 (Iowa 1989).

■ We note the utilities board is not required by statute to follow any particular formula in computing the rate base, determining a reasonable rate of return, or allocating costs among jurisdictions or customer classes. *See Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 594–99 (Iowa 1971). Where, as here, the legislature fails to provide a formula for the board to follow, courts cannot reject the one the board employs unless it "plainly contravenes the statutory scheme of regulation," or violates a rule of the board. *See Colorado Interstate Co. v. FPC*, 324 U.S. 581, 589, 65 S.Ct. 829, 833, 89 L.Ed. 1206, 1216 (1945). The board's choice of methods involves judgment of a myriad of facts and has no claim to an exact science. *See id.*

■ Accordingly, the appropriateness of the formula applied by the board in a given case raises questions of fact, not questions of law. *Id.* at 590, 65 S.Ct. at 833, 89 L.Ed. at 1216. If the board's choice of a method is supported by substantial evidence in the record when viewed as a whole, that choice must remain undisturbed on appeal. We have no authority to determine whether the board acted "wisely" in adopting a particu-

lar policy. *Iowa–Ill. Gas & Elec. Co. v. Iowa State Commerce Comm'n*, 412 N.W.2d 600, 604 (Iowa 1987). Rather, we will defer to the board's decisions in this highly technical area if they are within the zone of reasonableness. *Office of Consumer Advocate v. Iowa State Commerce Comm'n*, 432 N.W.2d 148, 152 (1988).

II. *Adequacy of Notice.*

■ By statute, all public utilities must give "written notice of a proposed increase of any rate or charge to all affected customers." Iowa Code § 476.6(5). This is the initial step in seeking a rate increase and unless notice is given, the board has no jurisdiction to permit rates proposed by a utility to be put into effect. *See* 73B C.J.S. *Public Utilities* § 45 at 259 (1983). When the adequacy of the statutorily required notice is questioned, the jurisdiction of the board also is questioned. Thus, the board should promptly determine whether adequate notice has been given before proceeding further since notice inadequacies, if any, may be more easily corrected at earlier stages of the proceedings.

■ If the public utility is subject to rate regulation, the statute requires the notice to state "that the customer has a right to file a written objection to the rate increase and that the affected customers may request the board to hold a public hearing to determine if the rate increase should be allowed." Iowa Code § 476.6(5). Therefore, the minimum notice established by statute must alert affected customers of the proposed rate increase, the right to object, and the right to request a hearing before the board.

■ Further notice requirements are established by rules promulgated by the board. *See* Iowa Code § 476.6(5) (the board shall prescribe the manner and method that the written notice to each affected customer shall be served). To the extent these rules are within the statutory authority of the board, they have the force and effect of law. *See Sommers v. Iowa Civil Rights Comm'n*, 337 N.W.2d 470, 475 (Iowa 1983). If the utility company uses the board's notification forms, prior ap-

proval of the notice is unnecessary. 199 Iowa Admin. Code § 7.4(1)(c)(1). If the notification is not in substantial compliance with the prescribed forms, the utility must seek prior approval of the notice from the board. 199 Iowa Admin. Code § 7.4(1)(d)(1). By rule, notice found deficient by the board does not constitute adequate notice under Iowa Code section 476.-6(5). 199 Iowa Admin. Code § 7.4(1)(d)(4).

The notification forms prescribed by the board for use by rate-regulated utilities attempt to alert customers of "the effect of the proposed increase on [the customer's] bill" by showing the current monthly charge, the proposed increase, the proposed monthly charge, and the percentage increase for each customer class. *See, e.g.,* 199 Iowa Admin. Code § 7.4(1)(c)(1) "Form A." If detailed rate schedules are involved, the notice must include "a paragraph specifically noting the services or systems for which any increase is proposed and advising customers to contact the utility's local business office for further explanation of the increase." 199 Iowa Admin. Code § 7.4(1)(c)(3). The notice forms further alert the customer of the right to object and to request a public hearing and of the availability of free information on all current and proposed rate schedules. *See* 199 Iowa Admin. Code § 7.4(1)(c)(3) "Form A."

In similar contexts, we have applied a rule of substantial compliance where it appears the utility made a good faith effort to comply with the notice requirements and no prejudice is shown by its failure to do so completely. *See, e.g., Fischer · v. Iowa State Commerce Comm'n,* 368 N.W.2d 88, 92–95 (Iowa 1985); *Anstey v. Iowa State Commerce Comm'n,* 292 N.W.2d 380, 385–86 (Iowa 1980). We thus examine the record to determine whether substantial compliance with the requirements established by rule and by statute is shown. ▬ Union used "Form A" to notify customers of its rate increase request. The notice stated Union was asking that an increase in rates be phased in over the next five years. According to the notice, the increase, if phased in, would be approxi-

mately 47.6 percent in the first year and eight percent per year for the next four years. The notice further explained the increase in annual revenues if a full, immediate increase was approved and the increase in revenue for the first year of the proposed phase-in if the rate phase-in was approved. It added that the increase in revenue in subsequent years of the phase-in would be approximately eight percent per year.

The effect of the proposed increases on each customer class was shown by tables set forth in the notice. For example, the "Proposed Full Increase" table showed the monthly rate of $46.89 for residential customers would increase to $92.46 for a percentage increase of 97.2 percent. The "Proposed Rate Increase—First Year of Phase–In" table showed the monthly rate of $46.89 for residential customers would increase to $71.97 for a percentage increase of 53.5 percent. The notice showed neither the effect of the proposed phase-in of rates for subsequent years nor the overall effect of the proposed phase-in of rates on a customer's bill.

Substantial compliance with the notice requirements is shown. The notice was in the form prescribed by the board is shown. It adequately apprised interested rate payers that a request was before the board which might lead to a rate increase affecting them, and that, if they wished to object or to request a public hearing, they should do so in timely fashion. *See, e.g., Colony Park Apartments v. Public Serv. Comm'n,* 155 Mich.App. 134, 141, 399 N.W.2d 32, 35 (1985). The notice revealed the essential attributes of the proposed rate increases. *See, e.g., North Ala. Express, Inc. v. United States,* 585 F.2d 783, 789 (5th Cir.1978) (public should be able to understand the essential attributes of the application); *Committee Against MRT v. Public Util. Comm'n,* 52 Ohio St.2d 231, 233, 371 N.E.2d 547, 549 (1977) (notice must disclose the essential nature or quality of the proposal to those affected by the rate increase). The board found the notice was adequate. Furthermore, the board found that Union made a good faith effort

to comply with the notice requirements and that no prejudice to ratepayers was shown. These findings are supported by substantial evidence. Therefore, the board had jurisdiction to approve a rate increase phased-in over a period of years.

III. *Extension of Ten–Month Deadline.*

■ The board has ten months to act upon the request of a public utility for a change in rates or charges. *See* Iowa Code § 476.6(13), unnumbered paragraph one. An exception to this rule is found in Iowa Code section 476.6(13), unnumbered paragraph two, which provides, in part:

> If the board finds that an extension of the ten-month period is necessary to permit the accumulation of necessary data with respect to the operation of newly constructed electric generating facility that has a capacity of 100 megawatts or more of electricity and that is proposed to be included in the rate base for the first time, the board may extend the ten-month period up to a maximum extension of six months.

Extension of the deadline is clearly within the discretion of the board and exercisable only upon finding the extension is *necessary* to permit accumulation of *necessary* data.

We recently recognized that the board may consider estimated costs in setting rates during the first year of a plant operation. *Iowa–Ill. Gas & Elec. Co.*, 412 N.W.2d at 608. Thus, it is not necessary that the board have before it a record of expenses from an actual "test year" before attempting to set just and reasonable rates. *See id.* Otherwise, the utility could not recover its costs until it presented "verifiable evidence after a year or more of operation." *Id.*

The parties submitted for the board's approval a joint stipulation that would extend the ten-month deadline. The board—recognizing that actual expense data was not necessary—concluded "there is no indication that extending the ten-month deadline will produce evidence that will be more acceptable or less subject to adjustment by

the parties." It did not feel an extension was warranted.

On our review of the whole record, we cannot conclude the board's decision was arbitrary, capricious, unreasonable, or affected by an abuse of discretion. The board's decision represents a policy choice favoring timeliness over precision. The board's refusal to extend the deadline will not be disturbed on appeal.

IV. *Stipulation.*

■ Under existing legislation, and within constitutional limitations, the board is free to adopt any rate base method deemed appropriate for determination of value upon which to fix a return rate. *Davenport Water Co. v. Iowa State Commerce Comm'n*, 190 N.W.2d 583, 599 (Iowa 1971). There is no denying that the board had the power to employ the method used in this case, apart from the stipulation. *Cf. Texas Gas Transmission Corp. v. FPC*, 441 F.2d 1392, 1394 (6th Cir.1971). We must determine whether the board's approval of the stipulation precluded its use of any method other than the one contemplated in the stipulation.

Stipulations are favored by courts where they are shown to be valid. *Bergman v. Bergman*, 247 Iowa 98, 103, 73 N.W.2d 92, 95 (1955). Stipulations allow the parties to avoid the delays and uncertainties of litigation. *Texas Gas Transmission Corp.*, 441 F.2d at 1394. For example, the stipulation approved by the board in this case established the findings of the Missouri Public Service Commission as a prima facie case for disallowance of $284 million from the rate base. *See In re Union Elec. Co.*, 66 P.U.R.4th 202 (Mo. Pub. Serv. Comm'n 1985). Furthermore, it shifted to Union the burden of establishing the prudence of these expenditures disallowed by the Missouri commission.

Courts are bound to enforce valid stipulations, and they ordinarily have no power to alter, amend, contradict, delete, or go beyond the terms of a stipulation. *In re Estate of Clark*, 181 N.W.2d 138, 142 (Iowa 1970). In construing stipulations, the court should attempt to ascertain and give effect to the intention of the parties. *Graen's*

*Mens Wear, Inc. v. Stille–Pierce Agency,* 329 N.W.2d 295, 300 (Iowa 1983). To this end, the stipulation should be interpreted with reference to its subject matter and in light of the surrounding circumstances and the whole record. *Id.*

We find no reason to depart from these principles where the board, rather than a court, approves a stipulation. Parties are entitled to rely on stipulations approved by the board in presenting their evidence and focusing their arguments on the issues narrowed but left unresolved by the stipulation. For example, there are at least twenty-nine formulas for allocating the costs of a rate increase among customer classes. *See Cities of Newark, New Castle & Seaford, Del. v. FERC,* 763 F.2d 533, 536 (3rd Cir.1985). Where the parties stipulate that a particular formula will be employed by the board, and the board approves this stipulation, and where the parties present evidence and arguments based on the expected use of the formula, it would be nothing short of capriciousness for the board to allocate costs by some other formula.

In this case, the parties clearly intended in their joint stipulation that the board would employ the "original cost or prudent investment" formula in ascertaining the rate base. *See Davenport Water Co.,* 190 N.W.2d at 588. That is, the elements that would go to make up the value of utility property would include prudence of the expenditures made. *In re Iowa Power & Light Co.,* 13 P.U.R.4th 164, 165 (Iowa State Commerce Comm'n 1976). Under the stipulation, up to $284 million of expenditures would be excluded from the rate base to the extent Union failed to prove the prudence of the expenditures.

■■■■ The board erred in employing a different formula or method in ascertaining the rate base. While the board is free to reject the stipulation of the parties as inappropriate, it must do so before and not after final acceptance. *Wilson v. Gauck,* 167 Mich.App. 90, 96, 421 N.W.2d 582, 585 (1988). Although the board's method may be more appropriate in determining the rate base where large projects are exam-

ined, the board's discretion was limited by its approval of the stipulation. The parties had no opportunity to present evidence or arguments on the propriety or the product of the board's chosen method. Accordingly, we reverse and remand to the board with instructions that to the extent Union has failed to prove prudence of the expenditures disallowed by the Missouri commission, up to to $284 million shall be excluded from the rate base.

Our holding on this point disposes of Union's challenge to the reasonableness of the board's method of determining the rate base.

### V. *Allowance for Funds Used During Construction for Callaway I.*

■■■■ We have explained the allowance for funds used during construction (AFUDC) in a recent case:

Funds borrowed by a utility to finance a plant under construction are not included in the utility's rate base. Hence the cost of those borrowed funds is not included in the debt component of the return on rate base. Rather, utilities capitalize this interest for ratemaking purposes in what is called the allowance for funds used during construction (AFUDC), which is added to the cost of the plant, included in rate base when the plant goes in service, and recovered through the depreciation expense included in the revenue requirement. Interest expense on funds borrowed to finance construction (the debt component of AFUDC) is deductible for income tax purposes.

*Office of Consumer Advocate v. Iowa State Commerce Comm'n,* 419 N.W.2d 373, 376 (Iowa 1988). *See also Butler Taconite Project v. Minnesota Pub. Util. Comm'n,* 332 N.W.2d 649, 651 (Minn.1983).

AFUDC may not be accrued on property which has been placed in service under the Federal Energy Regulatory Commission's "Uniform Systems of Accounts," a system incorporated by reference into the board's rules. 199 Iowa Admin. Code § 16.2 (1986). However, the board's system of accounts "does not dictate the rate-making treat-

ment to be accorded any item of revenue or cost." *In re Iowa Pub. Serv. Co.*, 46 P.U. R.4th 339, 343 (Iowa State Commerce Comm'n 1982). The board's rules provide:

> *Effect of rules.* In prescribing uniform systems of accounts for public utilities, the board does not commit itself to the approval or acceptance of any item set out in any account for the purpose of fixing rates or in determining other matters before the board. The prescribed systems of accounts are designed to set out the facts in connection with all sources of funds ... and the amount expended and due for each purpose ... and to provide for balance sheets showing various assets and liabilities ... and, therefrom, the board will determine, in connection with such matters as may be under advisement from time to time, what consideration shall be given to the various items in the several accounts.

199 Iowa Admin. Code § 16.1(2). Accordingly, the propriety of a departure from the Uniform Systems of Accounts is a question of fact rather than a question of law.

Here, the board allowed accrual of AFUDC after Callaway I's in-service date. AFUDC thus accrued until the costs of Callaway I were reflected in the rates. Essentially, the board eliminated the cost of "regulatory lag"—the gap between the in-service date of utility improvements and the date the costs of those improvements are reflected in the rates. Where the project is small, regulatory lag can be disregarded. But where the project is costly, regulatory lag may result in significant unrecoverable expense. The problem is intensified by the existence of multiple regulatory authorities—in this case, Union had to seek rate increases from four different regulatory authorities. Hence, the board found that Union "did not unreasonably delay the filing of its Iowa rate case."

The board's decision is supported by substantial evidence in the record as a whole. Its departure from the Uniform Systems of Accounts was not arbitrary, capricious, or unreasonable under the circumstances. The district court erred in reversing the board on this point. Its reliance on federal

law was misplaced. The federal commission operates under a regime quite different from ours. *See Kentucky Util. Co. v. FERC*, 760 F.2d 1321, 1325–27 (D.C.Cir. 1985).

Also under the Uniform System of Accounts, the cost rate for common equity used in calculating AFUDC is the rate granted common equity in the last rate proceeding before the rate-making body having primary jurisdiction. Electric Plant Instruction 3(17)(b), 18 C.F.R. part 101 (1985). The board decided not to depart from this rule and use its own rate, and it took official notice of the equity rate used by the Missouri commission under Iowa Code section 17A.14(4) (1985).

The board did not act unlawfully in taking official notice of the Missouri rate. Once it determined use of the Missouri rate was appropriate under its rule, the only remaining factual issue was the actual rate used by the Missouri commission. The rate used by the Missouri commission was a matter of historical fact and capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. It was not unfair for the board to deny the parties an opportunity to contest that fact. *See* Iowa Code § 17A.14(4).

VI. *Allocation of Costs Between Callaway I and Callaway II.*

Because Callaway I and Callaway II were based on a standardized plant design, the board allowed a transfer of common engineering costs from Callaway II to Callaway I so that those costs might be included in the rate base. Again, the propriety of the board's departure from accounting practices for the purpose of establishing rates is a question of fact, not a question of law. The board's finding that "the design costs would have been the same whether one or two plants were built" is supported by substantial evidence in the record as a whole. Given this finding, it was reasonable to limit the costs allocated to Callaway II only to those costs directly related to it, and to allocate the remaining common costs to Callaway I. Because the common costs would have been incurred in the construc-

tion of Callaway I in any event, it is reasonable to allow Union a return on its investment in common costs. Here also the court erred in reversing the board.

### VII. Recovery of Costs of Abandoned Nuclear Power Plant.

We recently recognized the board's authority to allow a utility to amortize the costs of an abandoned plant. *Office of Consumer Advocate v. Utilities Board*, 449 N.W.2d 383, 385–87 (Iowa 1989). Our holding in that case disposes of the consumer advocate's argument that the "used or useful" rule precludes recovery of abandoned plant costs.

Imprecise language in the board's decision spawned other complaints on appeal, however. The consumer advocate argues the board failed to find the utility's investment in Callaway II was prudent. The board had concluded:

> While Callaway II was cancelled, there is no indication this was imprudent. To deny a utility the ability to plan for a variety of demand scenarios and then to alter those plans as circumstances change, is to invite disaster for customers.

We understand the board's decision to find that, although the Callaway II project was cancelled, there is no indication the decision to construct Callaway II was imprudent. Our understanding is confirmed by the board's own summary of its findings of fact, which states: "Union Electric's decision to build Callaway Units I and II, at the time it was made, was prudent." The finding is supported by substantial evidence in the record as a whole, and we will not disturb it on appeal.

The above-quoted language also supports the board's allowance of costs from February 1977 when the Callaway II project was deferred or suspended, and October 1981, when it was finally cancelled. To disallow costs after suspension of a project would be "[t]o deny a utility the ability to plan for a variety of demand scenarios and then to alter those plans as circumstances change." The board's allowance of costs after February 1977 is supported by substantial evidence in the record

as a whole, and we will not disturb it on appeal. The district court erred in reversing the board on this point.

### VIII. Jurisdictional Allocation Methods.

When a utility furnishes electricity in two or more states, the utility's cost base must be allocated among the jurisdictions according to an appropriate method. Because each utility is uniquely structured, no single method of cost allocation may be considered appropriate for all systems. *Cities of Batavia, Naperville, Rock Falls, etc. v. FERC*, 672 F.2d 64, 80 (D.C.Cir. 1982). Two common methods focus on "coincident peaks" in the demand for electricity.

Under the twelve-month coincident peak (12–CP) method,

> demand costs are allocated by taking the hour of highest total usage (the coincident peak) during each of the preceding twelve months, determining the percentage of peak usage drawn by each [jurisdiction] during each of the twelve months, and averaging the resulting percentages for each [jurisdiction].

*Second Taxing Dist. of Norwalk v. FERC*, 683 F.2d 477, 480 (D.C.Cir.1982). The hypothesis underlying the 12–CP method is that plant size is designed to meet the demands season to season, month to month, day to day, and not just the maximum load on the system at any given time or any segment of the year. *Cities of Batavia*, 672 F.2d at 81. It "assumes that a utility's fixed costs principally relate to the demand on the utility throughout the year, and not to the maximum load on the system during its months of peak demand." *Cities of Bethany, Bushnell, Cairo, etc. v. FERC*, 727 F.2d 1131, 1135–37 (D.C.Cir.), *cert. denied*, 469 U.S. 917, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984).

In contrast, under the four-month coincident peak (4–CP) method, demand costs are allocated by taking the hour of highest total usage during each of the four "summer" months (June, July, August, and September), determining the percentage of peak usage drawn by each jurisdiction during each of the four months, and averaging

the resulting percentages for each jurisdiction. The hypothesis underlying this method is that plant size is designed to meet peak demands occurring during the summer months. *See Cities of Newark, New Castle and Seaford, Del. v. FERC,* 763 F.2d 533, 536 (3rd Cir.1985) (discussing the four-day coincident peak (4–DCP) method of demand cost allocation).

In order to determine which method is most appropriate, a number of factors should be considered. The system's "load characteristics" will show whether the customers tend to use fairly steady amounts of power throughout the year or tend to impose heavy seasonal demands. Heavy seasonal demands may result, among other things, from increased use of air-conditioning during the summer (summer-peaking) or increased use in electric heat during the winter (winter-peaking). *See, e.g. Cities of Batavia,* 672 F.2d at 80–83 (summer-peaking utility); *Pennsylvania Power & Light Co. v. Pennsylvania Pub. Util. Comm'n,* 101 Pa.Commwlth. 370, 383–84, 516 A.2d 426, 433 (1986) (winter-peaking utility).

One indicator of a system's load characteristics is the lowest monthly peak as a percent of annual system peak. According to evidence in the record for the years 1980 through 1984, Union's figure was fifty-eight percent. Another indicator is the average of the twelve monthly peaks as a percent of the annual system peak. Union's figure was seventy-three percent. One more indicator is the difference between the average of demands in peak months and the average of nonpeak demands as percentages of the annual system peak. Union's difference was thirty percentage points. When compared with FERC criteria and the load characteristics of other systems, these indicators clearly show that Union is a summer-peaking utility and that, according to Union's load characteristics, the 4–CP method is more appropriate than the 12–CP method for allocating costs. *See Cities of Batavia,* 672 F.2d at 80–85; *Cities of Newark,* 763 F.2d at 536; *Delmarva Power & Light Co.,* 22 FERC ¶ 63,052 at 65,205–06 (1983).

However, allocation of costs among jurisdictions is not merely a matter of averages and percentages, but also involves judgment and policy. *See Cities of Batavia,* 672 F.2d at 82–83. The board based its decision to use the 12–CP method on a number of appropriate factors. It recognized the desirability of uniformity among the jurisdictions, noting that all but one regulatory authority used the 12–CP method in allocating Union's costs. It discerned a significant problem—under or over recovery of costs where different allocation methods are used by other regulatory authorities. *See In re Northern States Power Co.,* 416 N.W.2d 719, 728 (Minn.1987); *In re Union Elec. Co.,* 67 P.U.R.4th 218, 221 (Ill.Commerce Comm'n 1985). It noted that the FERC guidelines are not binding. Finally, the record supports a finding that the 12–CP method may be more accurate and may better allocate the fixed costs of furnishing electricity throughout the year, regardless of whether Union is a summer-peaking utility or not.

Therefore, we cannot conclude the board's decision was arbitrary, capricious, unreasonable, or unsupported by substantial evidence in the record as a whole. The district court erred in reversing the board's decision.

Costs on appeal are taxed forty percent to the board, twenty-five percent to Union, twenty-five percent to the consumer advocate and ten percent to Amsted.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.